*530 HALEY, J.,
concurring, in part and dissenting, in part.
I.

CONCURRENCE

I concur in the majority’s view “that credible evidence ... supports the commission’s finding that the Program did not present for review the deputy commissioner’s ruling that the evidence was sufficient to entitle the infant to the Code § 38.2-5008 presumption.”
I respectfully dissent, however, to the majority’s view that the Program failed to rebut the Code § 38.2-5008 presumption.
II.

THE STATUTE AND THE PRESUMPTION

Succinctly stated, and as here applicable, under the Virginia Birth-Related Neurological Compensation Act (the “Act”), if an infant suffers “ ‘an injury to the brain’ ... that was ‘caused by deprivation of oxygen’ ” proximately causing permanent damage requiring assistance in daily living, a rebuttable presumption arises that “[t]he injury occurred ‘in the course of labor, delivery or resuscitation____’” Central Va. Obstetrics & Gynecology Assocs. v. Whitfield, 42 Va.App. 264, 272, 590 S.E.2d 631, 635 (2004) (quoting Code § 38.2-5001); see also Code § 38.2-5008; Wolfe v. Va. Birth-Related Neuro. Injury Comp. Program, 40 Va.App. 565, 577-78, 580 S.E.2d 467, 473 (2003).
“[T]o defeat the Code § 38.2-5008(A)(1) presumption, the Program must prove, to a reasonable degree of medical certainty ... both (1) that the [infant’s] ... injury did not occur ‘in the course of labor, delivery or resuscitation in the immediate post-delivery period in a hospital’ and (2) that there was a specific, non-birth-related cause of the injury.” Coffey v. Va. Birth-Related Neuro. Injury Comp. Program, 37 Va.App. 390, 402, 558 S.E.2d 563, 569 (2002) (citation omitted).
*531 III.

THE STANDARD OF REVIEW

While it is true that pursuant to Code § 38.2-5011, the determination of the full commission is conclusive as to questions of fact, “the reviewing court must assess whether there is credible evidence to support the Commission’s award.” Bass v. City of Richmond Police Department, 258 Va. 103, 115, 515 S.E.2d 557, 563 (1999) (emphasis added).
Credible evidence has been defined by Black’s Law Dictionary 366-67 (6th ed. 1990) as follows:
Evidence to be worthy of credit must not only proceed from a credible source but must, in addition, be “credible” in itself, by which is meant that it shall be so natural, reasonable and probable in view of the transaction which it describes or to which it relates as to make it easy to believe it, and credible testimony is that which meets the test of plausibility.
In Hercules, Inc. v. Gunther, 13 Va.App. 357, 361, 412 S.E.2d 185, 187 (1991), this Court stated:
On appeal, factual findings of the commission will not be disturbed if based on credible evidence. Morris v. Badger Powhatan/Figgie Int’l, Inc., 3 Va.App. 276, 279, 348 S.E.2d 876, 877 (1986). The commission may not arbitrarily disregard uncontradicted evidence of unimpeached witnesses, which is not inherently incredible and not inconsistent with other facts in the record. Id. Whether credible evidence exists to- support a factual finding is a question of law which is properly reviewable on appeal. See Ablola v. Holland Road Auto Ctr., Ltd., 11 Va.App. 181, 183, 397 S.E.2d 541, 542 (1990). Causation is a factual determination to be made by the commission, but the standards required to prove causation and whether the evidence is sufficient to meet those standards are legal issues which we must determine. Morris v. Morris, 238 Va. 578, 385 S.E.2d 858 (1989).
*532 The Virginia Supreme Court has also noted this distinction. In Goodyear Tire and Rubber Co. v. Watson, 219 Va. 830, 252 S.E.2d 310 (1979), the Court held:
Upon appeal, the Commission’s findings of fact, based on credible evidence, are conclusive and binding upon us. Code § 65.1-98. If, however, there is no credible evidence to support the Commission’s findings of fact, its findings are not binding on us and the question of the sufficiency of the evidence becomes one of law. [Great Atlantic & Pacific Tea Co.] A&P v. Robertson, 218 Va. 1051, 1053, 243 S.E.2d 234, 235 (1978); Conner v. Bragg, 203 Va. 204, 207, 123 S.E.2d 393, 395 (1962).
Id. at 833, 252 S.E.2d at 312.
Also pertinent to issues here raised is the standard by which physical evidence is to be contrasted to oral testimony.
“[W]hen physical facts are relied upon to overcome oral testimony they must be established by evidence so clearly preponderating that the existence of such facts is unmistakable.” Weddle v. Draper, 204 Va. 319, 323, 130 S.E.2d 462, 466 (1963). Oral evidence is overcome only when “ ‘the physical facts are such as to demonstrate that the oral evidence ... is incredible.’” Parker v. Davis, 221 Va. 299, 304-05, 269 S.E.2d 377, 381 (1980) (quoting Noland v. Fowler, 179 Va. 19, 23, 18 S.E.2d 251, 253 (1942)).
The commission’s decision must be likewise based upon competent evidence. To be credible, a medical opinion must be stated to a “reasonable degree of medical certainty or probability.” In a case involving the Code § 38.2-5008 presumption here under discussion, this Court reversed the commission’s finding that the Program had overcome the presumption. It did so because the commission had relied upon opinions offered by the Program which were not stated to a reasonable degree of medical certainty:
No physician concluded, to a reasonable degree of medical certainty, that [infant’s] injuries did not occur at birth---None of these opinions was stated to a reasonable degree of medical certainty____The evidence failed, as a matter of *533 law, to support the commission’s holding that the Program had rebutted the Code § 38.2-5008(A)(1) presumption.
Coffey, 37 Va.App. at 405-06, 558 S.E.2d at 570-71 (emphasis added). Furthermore, an expert opinion is merely speculative if not stated to a reasonable degree of medical probability. Pettus v. Gottfried, 269 Va. 69, 78, 606 S.E.2d 819, 825 (2005).
Finally, though not binding upon the commission, “we have said in a number of cases that great weight should be given to the testimony of the attending physician.” Williams v. Fuqua, 199 Va. 709, 714, 101 S.E.2d 562, 566 (1958).
Simply stated, the commission’s decision must be based upon evidence that is both credible and competent, and this Court may properly review de novo the credibility and competence of that evidence.
IV.

UNCONTRADICTED FACTS

The record in this case establishes certain relevant uncontradicted facts. These facts include the following: (1) The infant was born by cesarian section, and accordingly there was no “labor,” as applicable under the statute; (2) a sonogram done at 17 weeks showed the infant to be of normal fetal development and size; (3) after a gestation period of 29 weeks, at birth the infant weighed 1 pound, 14 ounces, which is the 10th percentile of expected weight for the gestational period; (4) “The infant was noted to cry at the surgical field upon delivery;”[1] (5) at “one minute of age baby did make some resp[iratory] effort;”[2] (6) the infant was intubated within one minute of birth; (7) the pathology of the placenta, performed the day following the infant’s birth, showed “infarction ... increased syncytial knotting ... consistent with chronic utero *534 placental insufficiency;”[3] (8) the infant had Apgar scores of 5 at one minute and 7 at fifteen minutes;[4] and (9) blood gas analysis within fifteen minutes of birth showed no evidence of hypoxemia[5] or metabolic acidosis,[6] and the same analysis two hours following birth had the same result.
V.

THE TIMING OF THE DEPRIVATION OF OXYGEN

As has been noted, the commission found, and this Court has affirmed, that the infant suffered a deprivation of oxygen which resulted in permanent injury. For the Program to rebut the presumption thus arising, it need not establish precisely when that deprivation occurred; rather, it must only establish that it did not occur, in this case, during birth or resuscitation. The timing of this deprivation is accordingly of signal importance.
As quoted above by the majority, with respect to timing, the commission rejected the opinion of the Program’s experts and accepted that of the claimants: “[0]f the physicians who have offered expert opinions in this case, we conclude that Drs. Hermansen and Latimer are the most qualified to evaluate the timing of the injury causing the infant’s cerebral palsy____” (Emphasis added). None of claimants’ experts were attending physicians. Their opinions, and those of another claimants’ expert, will be reviewed.
*535 Dr. Marcus Hermansen’s evidence consisted of a two-page letter dated July 13, 2003. He had reviewed Dr. Daniel Lefton’s letter. He states, in contradiction to the medical records, the infant “immediately after ... birth had no respiratory effort____” He likewise states, again in contradiction to the medical record: “[The infant] ... had a metabolic acidemia____”[7] He concurs in Dr. Lefton’s diagnosis of periventricular leukomalicia (PVL).[8]
Dr. M. Elizabeth Latimer’s evidence consisted of a three-page undated letter. She writes that the infant “had no respirations at birth____” She states: “there is no evidence of periventricular leukomalacia [PVL] on the initial [following birth] exam. The absence of the appearance of ... [PVL] ... makes it highly unlikely that the injury occurred significantly prior to delivery.” (Emphasis added). She makes no mention of the fact that blood gas analysis showed no metabolic acidosis following birth. At no point does she ever state that it is her opinion, to a reasonable degree of medical certainty, that PVL was the cause of the infant’s ultimate disability.
Dr. Daniel Lefton’s evidence consisted of a two-page letter dated July 7, 2003 to counsel for claimant. He recites he reviewed only the head ultrasound and MRI studies. He states: “You have advised me that ... according to the delivery records, at the time of birth [infant] had no respirations.” (Emphasis added). Thus, he relies upon counsel’s representation, not the medical records, that the infant was not breathing at birth. He neither reviewed, nor was apparently made aware of, the medical records of the blood gas *536 analysis which showed no hypoxemia or respiratory acidosis. Nevertheless, he finds, to a reasonable degree of medical certainty, that the infant suffered from PVL, resulting from a hypoxic-ischemic encephalopathy,[9] during birth or resuscitation, justifying compensation under the Program.
The expert evidence with respect to the timing of the deprivation of oxygen, that is, the opinions of Drs. Hermansen and Latimer, on which the commission specifically relied is, it is respectfully submitted, neither credible nor competent, for the following reasons.
Dr. Hermansen bases his opinion on the facts that the infant “had no respiratory effort ...” and “had metabolic acidemia. ...” It is uncontradicted that the attending physician, Dr. Choudhary, heard the infant “cry ... upon delivery____” The immediacy of that medical evidence, by the attending physician, augments its weight. And it is physical evidence. This Court can take judicial notice that sound may not be produced without an airstream.[10] The uncontradicted medical records show the infant cried, did make respiratory efforts, and did not have metabolic acidosis. Dr. Hermansen concurs in Dr. Lefton’s diagnosis of PVL, but, as noted above, Dr. Lefton did not review the medical records, makes no reference to the lack of metabolic acidosis, and bases his opinion of the representation of claimant’s counsel that the infant “at the time of birth had no respirations.”
*537 With respect to the report of Dr. Latimer, her opinion is likewise based upon the purported fact that the infant “had no respirations at birth....” She states that the lack of evidence of PVL on the initial exam “makes it highly unlikely that the injury occurred significantly prior to birth.... ” (Emphasis added). She makes no mention of the absence of metabolic acidosis. She never states her opinion to a reasonable degree of medical certainty.[11] “Highly unlikely” is not medical certainty, and the timing question is based upon a deprivation of oxygen during (or subsequent to) birth, not one that may have occurred in a period of time, significant or not, prior to birth.
Because Dr. Latimer does not state her opinion “to a reasonable degree of medical certainty,” her opinion is not competent, and fails “as a matter of law” to support the commission’s conclusion as to the timing of the deprivation of oxygen. See Coffey, 37 Va.App. at 402, 558 S.E.2d at 569. *538 The Virginia Supreme Court has previously stated that expert opinions which are “not stated to a reasonable degree of medical probability” are “speculative in nature and inadmissible.” Pettus, 269 Va. at 78, 606 S.E.2d at 825. Evidence of such a speculative nature, when contradicted by other factual evidence or expert opinions which are stated to a reasonable degree of medical probability, is not, it is submitted, credible.
Though not specifically relied upon by the commission in its determination of the timing of the deprivation of oxygen, Dr. James Peter VanDorsten, likewise not an attending physician, testified before the deputy commissioner on behalf of the claimant. Excerpts from his testimony include the following:
I construed the record to present a baby that was apniac, that was not breathing at all.
Q. A large part of your opinions are based upon the belief that this child had no signs of any respiratory effort. Correct? That is your belief?
A. That is what the record reflects.
Q. During the prenatal period was there any evidence of any significant growth restriction prior to delivery?
A. There was not.
Q. ... You’ve seen the blood gas results, and you know this baby had oxygen through intubation within a minute of birth. So it’s not your opinion that this baby was not well oxygenated, is it?
A. Oh, it’s my opinion the baby probably was not well oxygenated in the early going. I mean it wasn’t breathing at all____
(Emphasis added).[12]
Finally, in his testimony, Dr. VanDorsten re-affirms an opinion stated in his April 10, 2003 letter: “[I]t is my opinion, *539 to a reasonable degree of medical certainty, that prematurity is the cause of [the infant’s] cerebral palsy----This child’s cerebral palsy is the direct result of her unavoidable prematurity, i.e., delivery at 29 weeks gestation.” In this letter Dr. VanDorsten makes no reference whatsoever to a deprivation of oxygen.
Dr. VanDorsten’s testimony is not credible because it is based upon a fact not supported by the medical records, including that of the attending physician, that is, the infant made no respiratory effort and was not breathing at all. With respect to the signal issue of the timing of the oxygen deprivation, Dr. VanDorsten, as quoted above, says the infant was probably not well oxygenated. For this doctor to conclude that an infant with normal size and development at 17 weeks, and bom at 29 weeks weighing less than 10% of normal weight, showed no signs of prenatal growth restriction, is incredible.
With the above summary of the claimant’s evidence as to timing, we turn to that relied upon by the Program. As noted above in Part II of this dissent, to rebut the Code § 38.2-5008 presumption, the Program must first establish that the infant’s deprivation of oxygen did not occur, as here relevant, during birth or immediate attempts to resuscitate.
Pursuant to Code § 38.2-5008, the infant’s claim was “reviewed by a panel of three qualified and impartial physicians.” With respect to the timing of the deprivation of oxygen, in a letter dated June 9, 2003, the independent panel concluded: “No evidence of such deprivation of oxygen during the re *540 quired perinatal period is contained in these records.”[13]
Testifying on behalf of the Program was Dr. James Christmas.[14] His testimony, succinctly stated, establishes that deprivation of oxygen necessarily causes measurable metabolic acidosis, and, of critical import, evidence of that acidosis will not be dissipated for hours following the deprivation. As Dr. Christmas explained:
Well, when we breathe, when our cells breathe, when we at the cellular level do the things that we need to do to survive, cells burn glucose, and they burn glucose really efficiently. They burn it to carbon dioxide, which we then exhale and breathe off. When we are forced because of a lack of oxygen, we ourselves still need to make energy, and if they don’t have oxygen available to them, they burn acids to make energy, and those—the production of energy from acids is incredibly inefficient and it results in the byproduct or the end product of that process is very large fixed acids that are 8, 6, and 12 carbon acid molecules, and those molecules don’t cross the pulmonary capillaries, and so they build up in the blood stream, and ultimately they have to be metabolized by the liver and the kidneys before they can be cleared. So whether you’re a newborn or an infant or a fetus or an adult, if you develop a large metabolic acidosis from decreased—from insufficient oxygen, then that metabolic acidosis will take several to many hours to completely clear because those acids have to be metabolized back down created ultimately to carbon dioxide and then cleared.
In accordance with the finding of the medical panel, Dr. Christmas testified that the infant “had blood gas that demonstrated normal oxygenation ... and no evidence of a recent *541 metabolic acidosis, and when I say recent, I would say within several hours.” Likewise, he concluded: “In looking at the medical record there’s no evidence of any sustained oxygen deprivation____There is zero evidence of oxygen deprivation.”
Also introduced into evidence before the deputy commissioner was a Report of The American College of Obstetricians and Gynecologists and the American Academy of Pediatrics entitled Neonatal Encephalopathy and Cerebral Palsy (“the Report”). With respect to neonatal encephalopathy, the Report states: “The criteria to define an acute intrapartum[15] event sufficient to cause cerebral palsy ... [includes the following] ... Essential criteria (must meet all four). 1. Evidence of a metabolic acidosis in fetal umbilical cord blood obtained at delivery____”[16] (Footnotes added).
Finally, a finding of metabolic acidosis has been a pinion fact upon which this Court has relied in determining the timing of deprivation of oxygen. “At two minutes of life [infant’s] arterial chord blood gases were critically low. They remained low for almost two hours after his birth.” Coffey, 37 Va.App. at 394, 558 S.E.2d at 565. “[Infant’s] arterial blood gases were not satisfactory.” Va. Birth-Related Neurological Injury Comp. Program v. Young, 34 Va.App. 306, 313, 541 S.E.2d 298, 302 (2001); see also Whitfield, 42 Va.App. 264, 590 S.E.2d 631; Wolfe, 40 Va.App. at 575, 580 S.E.2d at 472.[17]
*542 From the foregoing, it is respectfully submitted that the Program has met its burden of proof to rebut the presumption that the deprivation of oxygen occurred during the birth or immediate attempts to resuscitate.
VI.

A SPECIFIC, NON-BIRTH-RELATED CAUSE

As noted above in Part II of this dissent, the Program bears a second evidentiary burden to rebut the Code § 38.2-5008 presumption, that of establishing a specific, non-birth-related cause of the infant’s injury.
The evidenced adduced by the Program supports the deputy commissioner’s conclusion that the infant did suffer a deprivation of oxygen causing the infant’s injury, probably from PVL, thus giving rise to the presumption. It was the Program’s position, and one with which the deputy commissioner agreed, that the cause of that deprivation was uteroplacental insufficiency. As Dr. Christmas explained:
Q. So then have you formed an opinion based upon a reasonable degree of medical certainty that the actual cause of [infant’s] condition today would have been útero ... A. Uteroplacental insuffiency.... I actually suspect that there was a specific ischemic event at some point or a hypoprofusion or a hypoxemic event.... That would be very common in a growth retarded fetus because a growth retarded fetus doesn’t have any other reserves that a term fetus has. So if a baby’s oxygen requirements—a baby’s oxygen requirements are here and a normal baby has oxygen levels, a normal fetus has oxygen levels up here, that’s no big deal. Little things happen in útero all the time and it never gets down to a threshold level where it’s going to cause any damage. Well, the growth-retarded fetus by *543 very definition is operating right at its threshold. So the little things that happen to a baby in útero all of a sudden become really important events. The periods of time when a fetus rolls over and compresses its umbilical cord for three minutes. For the normal term baby, I mean the normal appropriately grown baby that’s got a huge placental reserve, that’s no big deal. To the fetus that’s operating right on the edge, that’s a huge deal. So if you were to say, well, you think ischemia could be part of the picture, well, yeah. I mean because that’s all part of the whole sort of process of uteroplacental insufficiency. But there’s every evidence that that ended at delivery. It didn’t start at delivery. There’s every evidence that it probably ended many hours before delivery as far as the acute event.
Dr. Christmas continued:
I think that prematurity is the single leading risk factor for periventricular leukomalacia [(PVL)] in the general population as well as in any specific fetus. A preterm delivery complicated by a small for gestational age fetus is at a significantly higher risk of periventricular leukomalacia than is an appropriately grown preterm fetus.
As noted above, claimant’s expert, Dr. VanDorsten, in his opinion letter of April 10, 2003, does not mention a deprivation of oxygen, but writes, in accordance with Dr. Christmas’s view: “[I]t is my opinion, to a reasonable degree of medical certainty, that prematurity is the cause of [the infant’s] cerebral palsy.”
It is uncontradicted that the infant had normal development at 17 weeks gestation and at birth weighed in the 10th percentile of an infant born at 29 weeks. It is clear that an event or condition adverse to the fetus occurred in that time period. It is uncontradicted that the pathology of the placenta showed “infarction ... increased syncytial knotting ... consistent with chronic uteroplacental insufficiency.” This Court has specifically noted the significance of evidence of uteroplacental insufficiency in birth-related cases. “The records also *544 revealed no evidence of utero-placental insufficiency or cord compression.” Wolfe, 40 Va.App. at 571, 580 S.E.2d at 470.
Assuming the infant did have PVL, the rational conclusion, based upon the credible and competent evidence, is that the condition was caused by uteroplacental insufficiency, not by a deprivation of oxygen during birth or immediate attempts to resuscitate. Accordingly, it is submitted, the Program has established a non-birth-related cause of the injury.
VII.

CONCLUSION

For the above reasons, I believe the Program has met the burden of meeting both prongs necessary to rebut the presumption arising from Code § 38.2-5008. I would reverse the commission and uphold the opinion of the deputy commissioner.
In Meador v. Va. Neuro. Birth-Related Injury and Comp. Program, 44 Va.App. 149, 604 S.E.2d 88 (2004), this Court affirmed the commission’s decision that the Act did not apply to a birth at home. In so doing, we noted:
The Act cannot be applied with any interpretative preset in favor of coverage, for to do so would undermine two important features of the Act. First, the statute’s “finely engineered quid pro quo____” Second, when statutes displace common law principles governing tort liability, the statutes should be “strictly construed” and not “be enlarged in their operation by construction beyond their express terms.” Jan Paul Fruiterman, M.D. & Assocs., P.C. v. Waziri, 259 Va. 540, 544, 525 S.E.2d 552, 554 (2000) (quoting Schwartz v. Brownlee, 253 Va. 159, 166, 482 S.E.2d 827, 831 (1997)).
44 Va.App. at 152-53, 604 S.E.2d at 90 (citing Whitfield, 42 Va.App. at 271, 590 S.E.2d at 635).
One cannot but have empathy for this infant, and this infant’s parents. However, it is respectfully submitted that the commission’s decision in this case does not comport with *545 the strictures of the Act, as set forth in the same by the legislature, and with the decisions of this Court.

. Operative Report of Dr. Namata Choudhary, who performed the cesarian section. Columbia Reston Hospital.

. Newborn Resuscitation Record, 09/02/99, Columbia Reston Hospital.

. Pathology Report, 09/03/99, Columbia Reston Hospital.

. "The Apgar rating scale ranges from 1 to 10. It provides a numerical expression that assesses heart rate, respiratory effort, muscle tone, reflex, irritability, and color.” Whitfield, 42 Va.App. at 270 n. 1, 590 S.E.2d at 634 n. 1 (citations omitted) (emphasis supplied).

. Hypoxemia is “deficient oxygenation of the blood." Dorland’s Medical Dictionary 812 (28th ed. 1994).

. Metabolic acidosis is also called nonrespiratory acidosis. Dorland’s, supra, at 16.

. When Dr. Christmas was asked about Dr. Hermansen’s reference to metabolic acidemia, he responded “I couldn’t find that in the chart.” Appellees have never presented any evidence that metabolic acidemia occurred sufficient to cause neurologic injury. Even assuming there was some evidence of mild metabolic acidosis, the uncontradicted testimony of Dr. Christmas was that it was "not evidence of metabolic acidosis to a degree that has been associated with long-term neurologic injury.”

. PVL is a hypoxic-ischemic injury to the white matter of the brain surrounding tíre ventricles.

. Hypoxic-ischemic encephalopathy is a degenerative disease' of the brain caused by a lack of oxygen during the fetal stage of development or during labor, birth or resuscitation. See Dorland's, supra, at 550.

. "Thus, our courts will take judicial notice of the operation of the laws of physics and other natural phenomena, and the effects of such physical laws upon human beings; ... of human ... capabilities....” Charles E. Friend, The Law of Evidence in Virginia § 19-15 (6th ed. 2003); Pearcey v. St. Paul Fire & Marine Ins. Co., 163 Va. 928, 936, 177 S.E. 843, 846 (1935); "sounds are made with air exhaled from the lungs.... This airstream is shaped into different sounds.” "Speech,” Encyclopedia Britannica (2005). In short, judicial notice can be taken that there cannot be a "cry” without air being exhaled from the lungs.

. The majority cites Island Creek Coal Co. v. Breeding, 6 Va.App. 1, 365 S.E.2d 782 (1988), for the proposition that we will not substitute form over substance by requiring a physician to use the magic words “to a reasonable medical certainty.” Id. at 11-12, 365 S.E.2d at 788. In Island Creek Coal Co., however, the record contained no evidence to contradict the physician’s opinion. Id. Here, significant credible evidence directly contradicts Dr. Latimer’s opinions. Therefore, the fact that her testimony is not “to a reasonable degree of medical certainty” becomes substantive, rather than a mere matter of form.
Additionally, the majority cites Lindenfeld v. City of Richmond Sheriffs Office, 25 Va.App. 775, 492 S.E.2d 506 (1997), and an amendment to Code § 65.2-401 to show that whether expert medical opinions are "to a reasonable medical certainty” has little to no bearing on the weight the commission should give such testimony. In fact, since both Lindenfeld and the Code amendment, this Court has continued to rely on the distinction between those opinions stated "to a reasonable degree of medical certainty” and those not. See, e.g., Coffey, 37 Va.App. at 406, 558 S.E.2d at 571 (holding that the evidence failed to establish a specific, non-birth-related cause of injury when the doctor’s opinion did not identify one "to a reasonable degree of medical certainty").
Furthermore, the removal of "to a reasonable medical certainty” from Code § 65.2-401 occurred before the decision in Lindenfeld, 1997 Va. Acts, c. 15, and relates strictly to the burden of proof in "ordinary disease of life coverage” under the Workers’ Compensation regime. Indeed, the change does not even affect the majority of Workers’ Compensation Commission cases, let alone the role of medical certainty in opinion testimony generally, or in birth-related neurological defect cases specifically.

. Dr. VanDorsten does speculate at one point as to what a blood gas taken earlier would have shown:
Q. Do you have an opinion as to what a blood gas taken prior to fifteen minutes of life would have shown?
*539 A. I think it likely would have been reflective of hypoxemia and probably respiratory and even perhaps metabolic acidosis.
The deputy commissioner’s opinion also notes the speculative nature of this testimony. Such speculation has no bearing on a case when actual evidence, taken only minutes later, contradicts it. This Court has previously declined to presume the results of a test for metabolic acidosis that was not performed, absent negligent or intentional failure by the medical professionals present to perform such a test. Wolfe, 40 Va.App. at 585, 580 S.E.2d at 477.

. It is noted that "the commission is not bound by the opinion of an independent expert it selects----” Island Creek Coal Co. v. Honaker, 9 Va.App. 336, 339, 388 S.E.2d 271, 272-73 (1990).

. Dr. Christmas’s opinion was likewise stated in a July 1, 2003 letter introduced into evidence: "Initial blood gas evaluation within 15 minutes of delivery demonstrated no evidence of hypoxemia or metabolic acidosis.”

. Intrapartum means: "Occurring during childbirth, or dining delivery." Dorland’s, supra, at 854.

. This Court has relied upon the standards of the American College of Obstetricians and Gynecologists in a prior opinion. See Wolfe, 40 Va.App. at 585, 580 S.E.2d at 477.

. It should also be noted that this Court has consistently relied upon Apgar scores for timing determinations in birth-related cases. As set forth in footnote 4 of this dissent, an Apgar score includes an evaluation of respiratory effort. “His Apgar scores were 0 at one minute, 1 at five minutes, and 5 at ten minutes.” Young, 34 Va.App. at 313, 541 S.E.2d at 302; "At one minute of life [infant's] APGAR score was two out of a possible ten.” Coffey, 37 Va.App. at 394, 558 S.E.2d at 565; "received an APGAR score of 9 at both one and five minutes after birth.” Kidder v. Va. Neuro. Birth-Related Injury Comp. Program, 37 Va.App. 764, 767, 560 S.E.2d 907, 908 (2002) (affirming the commission’s denial of *542 benefits); "His Apgar scores were 1 at one minute, 0 at 5 minutes, and 0 at 10 minutes.” Whitfield, 42 Va.App. at 269-70, 590 S.E.2d at 634. It is uncontradicted that the infant involved here had Apgar scores of 5 at one minute and 7 at fifteen minutes.